El Juez Asociado Señor Rivera García
emitió la opinión del Tribunal.
Mediante los recursos aquí consolidados se nos solicita que declaremos la inconstitucionalidad de la Ley Núm. 7 de 9 de marzo de 2009, según enmendada, conocida como Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico. Los referidos petitorios, en gran medida, reproducen los mismos planteamientos esbozados y ya adjudicados en Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1 (2010), cert. denegado, Castro v. Puerto Rico, 131 S.Ct. 152 (2010). Así también, se aducen razones adicionales por las cuales se debe declarar incons-titucional la Ley Núm. 7, supra. Asimismo, nos solicitan que decretemos la nulidad de las cartas de antigüedad y cesantías remitidas por los peticionarios y que ordenemos la reinstalación inmediata de los empleados cesanteados. Veamos.
I

CT-2010-0001

El 26 de enero de 2010, el Sindicato de Bomberos Uni-dos de Puerto Rico(1) (SBUPR) presentó ante el Tribunal de Primera Instancia una demanda sobre sentencia declara-toria e interdicto preliminar y permanente contra el Cuerpo de Bomberos de Puerto Rico; Sr. Pedro A. Vázquez *730 Montañez, Jefe de Bomberos Interino; Estado Libre Aso-ciado de Puerto Rico, y Guillermo Somoza, Secretario de Justicia(2) En específico, el SBUPR alegó que el 28 de diciembre de 2009 le notificaron por correo certificado las copias de las cartas de cesantías que les remitieron, en esa misma fecha, a algunos de sus miembros. Añadió que dichas misivas informaron que las cesantías de sus miem-bros serían efectivas el 29 de enero de 2010, con excepción de uno (1) de ellos cuya fecha de cesantía sería efectiva el 19 de enero de 2010.(3) Asimismo, el SBUPR adujo que las comunicaciones de cesantías antes descritas eran nulas porque las firmó una persona sin capacidad jurídica para ello, el Sr. Pedro A. Vázquez Montañez, Jefe de Bomberos Interino(4) y que la Ley Núm. 7, supra, era inconstitucio-nal porque se aprobó en violación a la Sec. 17 del Art. Ill de la Constitución de Puerto Rico, L.P.R.A., Tomo l.(5)
Consecuentemente, el SBUPR razonó que las referidas cartas de cesantías fueron notificadas en detrimento del principio de simultaneidad contenido en el Artículo 37.04(b) de la Ley Núm. 7, supra, pues a sus miembros no les informaron de sus cesantías en la misma fecha. Ello implica, supuestamente, que las cesantías anunciadas no entraron en vigor y que todo el procedimiento era nulo(6) Concluyó, además, que las cartas de cesantía eran nulas porque el Gobernador de Puerto Rico no designó o nombró *731 al señor Vázquez Montañez, y el Senado de Puerto Rico tampoco lo confirmó para actuar como Jefe de Bomberos Interino, ejercer tales funciones y mucho menos emitir las referidas misivas.(7) Asimismo, el SBUPR coligió que la Ley Núm. 7, supra, era inconstitucional debido a que invo-lucra más de un asunto y contiene materias incongruentes entre sí, en violación de la Sec. 17 del Art. Ill de la Cons-titución de Puerto Rico, supra.i.(8)
El 9 de febrero de 2010, el Estado presentó un recurso de certificación ante este Tribunal acompañado por una moción en auxilio de jurisdicción. En ambos recursos, aparte de indicar que la mayoría de las alegaciones verti-das en la demanda presentada por SBUPR se habían ad-judicado en Domínguez Castro et al. v. E.L.A. I, supra, el Estado argumentó que las controversias no resueltas, ahora ante la consideración del Tribunal de Primera Ins-tancia, estaban revestidas de un gran interés público y que este Tribunal debía atenderlas. Al día siguiente, 10 de fe-brero de 2010, emitimos una resolución en la cual ordena-mos la paralización de los procedimientos ante el foro pri-mario y expedimos el recurso de certificación.
II

CT-2010-0002

El 5 de enero de 2010, la organización sindical Servido-res Públicos Unidos de Puerto Rico/AFSCME, Concilio 95 (SPU),(9) presentó una demanda ante el Tribunal de Pri-mera Instancia sobre sentencia declaratoria e interdicto *732 preliminar y permanente contra el Estado Libre Asociado de Puerto Rico; el Departamento de Educación, por con-ducto de su otrora Secretaria la Sra. Odette Piñeiro; el De-partamento de la Familia, por conducto de su Secretaria la Leda. Yanitsia Irizarry Méndez; la Administración para el Sustento de Menores, por conducto de su Administrador el Ledo. Waddy Mercado Maldonado; el Departamento de Transportación y Obras Públicas, por conducto de su Se-cretario el Sr. Rubén Hernández Gregorat, y el Departa-mento de Recursos Naturales y Ambientales, por conducto de su Secretario el Sr. Daniel Galán Kercadó. En ella, la SPU alegó que los codemandados incumplieron con las exi-gencias de notificación establecidas por el Art. 37.04(b)(2), (3), (7), (9), (11) y (15) de la Ley Núm. 7, supra, debido a que las cartas de cesantía enviadas a algunos de sus miem-bros fueron notificadas con menos de treinta días calenda-rio de antelación a la fecha de su efectividad y que a otros miembros no se les notificó carta de cesantía alguna.(10)
A su vez, la SPU adujo que la Ley Núm. 7, supra, se aprobó en abierta violación a la Sec. 17 del Art. Ill de la Constitución de Puerto Rico, supra, la cual prohíbe que se apruebe una ley que contenga más de un solo asunto. Ade-más, indicó que el resultado de dicha aprobación fue “una ley incongruente que combina legislación sobre materias y que deroga una serie de de [sic] leyes, reglamentos y polí-ticas públicas establecidas, especialmente cuando ha des-mantelado [de facto] agencias cuyas políticas públicas ex-presamente consignadas en estatutos no han sido oficialmente derogadas”.(11)
*733 Consecuentemente, la SPU razonó que sus miembros, notificados o no de sus cesantías, se encuentran en un es-tado de indefensión y que se les ha privado de un interés propietario en abierta violación al debido proceso de ley y al procedimiento establecido en el Art. 37.04(b) de la Ley Núm. 7, supra.(12) Por ello solicitó la celebración de una vista en donde se dirimiera la expedición de un interdicto que les ordenara a los demandados abstenerse de cesan-tear a los empleados que ella representa.(13) Solicitó, ade-más, que se declarara la inconstitucionalidad de la Ley Núm. 7, supra, porque se aprobó en violación a la Sec. 17 del Art. Ill de la Constitución de Puerto Rico, supra.
Luego de varios trámites procesales, el 22 de febrero de 2010, el Tribunal de Primera Instancia emitió una orden. En ella el foro primario indicó que celebraría una vista el 11 de marzo de 2010 para dilucidar si procedía el recurso extraordinario solicitado por la SPU.
Así las cosas, el 9 de marzo de 2010, el Estado presentó ante este Tribunal un recurso de certificación acompañado por una moción urgente al amparo de la Regla 28 del Re-glamento de este Tribunal, 4 L.P.R.A. Ap. XXI-A. Aparte de indicar que la mayoría de las alegaciones vertidas en la demanda presentada por SPU se adjudicó en Domínguez Castro et al. v. E.L.A. I, supra, el Estado argumentó en ambos recursos, nuevamente, que el alto interés público que revisten las controversias ante la consideración del Tribunal de Primera Instancia, las cuales no se resolvieron en el caso antes mencionado, amerita la atención de este Tribunal. Ese mismo día emitimos una resolución en la *734 cual ordenamos la paralización de los procedimientos en el foro primario y expedimos el recurso de certificación.(14)
III

AC-2010-0018

El 5 de noviembre de 2009, la Federación Central de Trabajadores (FCT)(15) presentó una demanda sobre inter-dicto preliminar y permanente ante el Tribunal de Primera Instancia en contra del Departamento de la Vivienda, el Departamento de Recreación y Deportes, y el Estado Libre Asociado de Puerto Rico(16) En ella adujo que las notifica-ciones de cesantía enviadas a los miembros que representa en la acción de autos eran defectuosas.
En específico, y en cuanto a los empleados del Departa-mento de la Vivienda, la FCT alegó que del 25 hasta el 30 de septiembre de 2009 dicha agencia le envió una carta a varios de sus empleados para notificarles sus respectivas cesantías,(17) y que no fue hasta el 5 de octubre de 2009 que, por conducto de su secretario-tesorero, el Sr. Andrés Lloret, se notificó personalmente de estos despidos. Esta notificación personal, añadió la FCT, consistió en la en- *735 trega de un expediente que contenía copia de las cartas de cesantía enviadas a los empleados.(18)
De igual forma, en cuanto a los empleados del Departa-mento de Recreación y Deportes, la FCT alegó que desde el 25 de septiembre de 2009 hasta el 1 de octubre de 2009 dicha agencia le notificó a varios de sus empleados, tam-bién mediante comunicación escrita, sus respectivas cartas de cesantía,(19) y que no fue hasta el 6 de octubre de 2009 que se le notificaron estos despidos. Dicha notificación, añadió la FCT, consistió en entregarle personalmente a su Delegada General, la Sra. Irba Batista, un expediente que contenía copia de las cartas de cesantía. (20)
Por todo lo anterior, la FCT concluyó que las notificacio-nes de las cesantías antes descritas eran defectuosas por contravenir lo establecido en el Art. 37.04 de la Ley Núm. 7, supra, y por violentar el debido proceso de ley. Esto, pues alega que dicho articulado exige que las cesantías decreta-das se notifiquen simultáneamente al empleado y a la or-ganización sindical que lo representa mediante comunica-ciones escritas separadas e independientes. Conse-cuentemente, solicitó que se emitiera un interdicto provisional para ordenar la revocación de las cartas de cesantía.(21)
El 16 de noviembre de 2009, el Tribunal de Primera Instancia celebró una vista. En la referida audiencia las partes expresaron que no era necesario celebrar una vista evidenciaría porque no existía controversia sobre ningún hecho medular, lo que hacía innecesaria la presentación de prueba. Ante ello, el foro primario les ordenó a las partes que redujeran a escrito todos los hechos sobre los cuales no versaba controversia alguna para poder dictar sentencia. *736 Dos días más tarde —el 18 de noviembre de 2009— las partes presentaron una moción que cumplía con lo ordenado.(22)
Además, ese mismo día la parte demandada presentó una moción intitulada Moción Urgente Solicitando Deses-timación y/o Sentencia Sumaria. En ella, adujo que el Tribunal de Primera Instancia carecía de jurisdicción para adjudicar la presente controversia porque la Ley Núm. 7, supra, le confirió jurisdicción primaria exclusiva a la Co-misión de Relaciones del Trabajo del Servicio Público (CRTSP) para atender los asuntos relacionados a las cesantías.(23)
Luego de varios trámites procesales,(24) el 12 de enero de 2010, el Tribunal de Primera Instancia dictó una sentencia y declaró “no ha lugar” la moción urgente que presentó la parte demandada. Además, concluyó que las notificaciones de cesantías no se realizaron conforme a derecho, por lo que éstas eran nulas y carecían de efectividad por estar reñidas con el debido proceso de ley.
Conforme a ello, el foro primario expidió el interdicto permanente solicitado. Al así hacerlo, dejó sin efecto las notificaciones de las certificaciones de antigüedad y las cartas de cesantía que le enviaron a los empleados repre-sentados por la FCT. De igual forma, ordenó el pago de todos los haberes que los empleados cesanteados dejaron de percibir desde la fecha en que los despidieron.(25)
Inconforme, el 19 de enero de 2010, la parte demandada presentó un recurso de apelación ante el Tribunal de *737 Apelaciones.(26) En dicho recurso alegó que el Tribunal de Primera Instancia erró al declarar “sin lugar” la moción urgente y al concluir que las cartas de cesantía eran nulas porque no se notificaron simultáneamente. Añadió que no procedía conceder el interdicto solicitado por la parte de-mandante ni dejar sin efecto las cartas de cesantía y las certificaciones de antigüedad, máxime cuando estas últi-mas no fueron objeto de controversia alguna.(27)
Además, ese mismo día la parte demandada presentó una moción urgente ante el Tribunal de Apelaciones. En ella le solicitó al foro apelativo intermedio que paralizara los efectos de la sentencia apelada hasta que dicho foro atendiera el recurso de apelación presentado.
Luego de evaluar detenidamente los argumentos de am-bas partes, el 1 de febrero de 2010, el Tribunal de Apela-ciones emitió una resolución mediante la cual concluyó que no procedía dictar la orden de paralización solicitada por los demandados.(28) Asimismo, el 22 de febrero de 2010, el foro apelativo intermedio dictó una sentencia mediante la cual confirmó el dictamen que emitió el Tribunal de Pri-mera Instancia.(29)
No conteste con el referido dictamen, el 1 de marzo de 2010, la parte demandada presentó ante este Tribunal un recurso de apelación acompañado por una moción urgente en auxilio de jurisdicción. En dicho recurso, señaló la comi-sión del error siguiente:
Erró el Tribunal de Apelaciones al confirmar la sentencia del TPI y concluir que las notificaciones de las cesantías cursadas a los empleados y empleadas del DV y del DRD afiliados a la apelada son nulas, al no habérsele notificado simultáneamente de dichas cesantías a la FCT. Apelación, pág. 11.
Por otro lado, en la moción urgente, la parte demandada *738 solicitó que se paralizaran los efectos de la sentencia dic-tada por el Tribual de Apelaciones hasta que se atendieran las controversias planteadas en el recurso de apelación. A esos efectos, luego de examinar ambos recursos, el 16 de marzo de 2010 emitimos una resolución mediante la cual acogimos el recurso de apelación presentado como certio-rari y le concedimos a la FCT un término de veinte días para que se expresara en cuanto a lo solicitado. A su vez, ordenamos la paralización de los efectos de la sentencia que dictó el Tribunal de Apelaciones.
Posteriormente, el 2 de diciembre de 2010 emitimos otra resolución mediante la cual ordenamos la consolidación de los casos CT-2010-0001, CT-2010-0002 y AC-2010-0018, por presentar cuestiones comunes de derecho. Regla 38.1 de Procedimiento Civil de 2009 (32 L.P.R.A. Ap. V). Por ello, y con el beneficio de la comparecencia de todas las partes, procedemos a resolver.
IV
En Domínguez Castro et al. v. E.L.A. I, supra, adjudica-mos la mayoría de las controversias planteadas en los ca-sos consolidados que hoy nos ocupan. En aquella ocasión consolidamos cuatro recursos de certificación(30) en donde varios empleados públicos impugnaron la constitucionali-dad de la Ley Núm. 7, supra, y cuestionaron sus cesantías a raíz de la implementación de dicho estatuto.
En cuanto a los reclamos de los empleados cesanteados sobre la inconstitucionalidad de la Ley Núm. 7, supra —por estar reñida con el debido proceso de ley en su vertiente sustantiva— indicamos que aun cuando los empleados públicos de carrera poseen un interés propietario sobre sus plazas y que ello garantiza la concurrencia de un debido proceso de ley, este derecho de propiedad no es *739 absoluto. “ ‘Está supeditado a intereses sociales que se agrupan en el concepto de ‘poder de razón de estado’ o ‘police power’.” Domínguez Castro et al. v. E.L.A. I, supra, págs. 35-36. Véanse: Emp. Pur. Des., Inc. v. H.I.E.Tel., 150 D.P.R. 924, 954 (2000); Velázquez Velázquez v. E.L.A., 135 D.P.R. 84 (1994); Vázquez v. A.R.Pe., 128 D.P.R. 513 (1991); The Richards Group v. Junta de Planificación, 108 D.P.R. 23 (1978); Pierson Muller I v. Feijoó, 106 D.P.R. 838 (1978); Lupiáñez v. Srio. de Instrucción, 105 D.P.R. 696 (1977).
Luego, al hacer una exposición histórica y normativa sobre el poder de razón de estado, señalamos que desde 1915, en El Pueblo v. García & García, 22 D.P.R. 817 (1915), este Tribunal resolvió que los ataques constitucionales a medidas de reglamentación socioeconómica fundamentados en la cláusula de debido proceso de ley —en su vertiente sustantiva— se analizan según el crisol de un escrutinio racional. Domínguez Castro et al. v. E.L.A. I, supra, pág. 45, citando a J.J. Alvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis, 2009, págs. 631-632. Expresamos, además, que la Legislatura —en el ejercicio de su poder de “razón de estado”— tiene amplia facultad para la reglamentación de carácter económico, siempre y cuando exista una relación real y sustancial entre dicha reglamentación y el objetivo económico que se persigue. Además, la normativa adoptada no debe ser irrazonable, arbitraria o caprichosa. Id. Así, indicamos que al analizar un estatuto de carácter socioeconómico, los tribunales tienen que otorgarle gran deferencia a la pieza legislativa que se impugna y presumir su constitucionalidad. De modo que el peso de la prueba recae sobre quien cuestiona su validez. Domínguez Castro et al. v. E.L.A. I, supra, pág. 45; Marina Ind., Inc. v. Brown Boveri Corp., 114 D.P.R. 64 (1983).
Cónsono con lo anterior, resolvimos que la Ley Núm. 7, supra, en el contexto de las cesantías que autoriza *740 y promueve, así como la eliminación de unos procesos an-teriores a esas cesantías, constituye una acción razonable del Estado dirigida a salvar la solvencia del erario, por lo que no infringe el debido proceso de ley sustantivo. Ello, a raíz de la emergencia fiscal que originó su aprobación y los fines que persigue. Domínguez Castro et al. v. E.L.A. I, supra, pág. 62.
Además, en cuanto a las reclamaciones de los empleados cesanteados sobre la inconstitucionalidad de la Ley Núm. 7, supra, por ser contraria al debido proceso de ley en su vertiente procesal, señalamos que el procedimiento de cesantías establecido por dicho estatuto sobrepasa los requisitos establecidos por la normativa jurisprudencial. Domínguez Castro et al. v. E.L.A. I, supra, pág. 65; Rivera Rodríguez & Co. v. Lee Stowell, etc., 133 D.P.R. 881, 888 (1991), y no infringe el referido derecho. A esos efectos, afirmamos que la Ley Núm. 7, supra, “[le] concede al empleado público cesanteado ... la oportunidad de una vista previa antes de que se le anuncie su cesantía si éste así lo solicita”. (Enfasis suprimido.) Domínguez Castro et al. v. E.L.A. I, supra, pág. 65.
De igual forma, aunque en los recursos aquí consolida-dos no se presenta esta controversia, en cuanto a la igual protección de las leyes y la alegada clasificación sospechosa que la Ley Núm. 7, supra, implementa, sostuvimos que la diferencia en tratamiento que promueve la aplicación del referido estatuto entre las tres Ramas del Gobierno no ofende ni viola la cláusula de la igual protección de las leyes. Esto porque se trata de una clasificación razonable, fundamentada en un interés público legítimo. Domínguez Castro et al. v. E.L.A. 1, supra, pág. 79.
Por su parte, en cuanto a los reclamos de los empleados cesanteados sobre la inconstitucionalidad de la Ley Núm. 7, supra, por estar reñida con la cláusula constitucional que prohíbe el menoscabo de obligaciones contractuales, indicamos que la función del foro judicial con- *741 siste en establecer un balance entre el poder de “razón de estado” para salvaguardar el bienestar y la seguridad de la ciudadanía y el interés de proteger las relaciones contractuales. Domínguez Castro et al. v. E.L.A. I, supra, pág. 81. Véanse, además: United States Trust Co. v. New Jersey, 431 U.S. 1 (1977); Warner Lambert Corp. v. Tribunal Superior, 101 D.P.R. 378 (1973). Añadimos que “la ga-rantía constitucional contra el menoscabo de obligaciones contractuales se activa cuando la modificación afecta ad-versamente los términos o condiciones esenciales del con-trato que principalmente dieron motivo a la celebración [del mismo,] de modo que se frustren las expectativas ra-zonables de las partes”. Domínguez Castro et al. v. E.L.A. I, supra, pág. 83. Véanse, además: Allied Structural Steel Co. v. Spannaus, 438 U.S. 234 (1978); El Paso v. Simmons, 379 U.S. 497 (1965). Así, una vez determinado que el menos-cabo es sustancial, se debe auscultar si la modificación contractual establecida es razonable y necesaria para adelan-tar un interés público importante en beneficio del bienestar general. Domínguez Castro et al. v. E.L.A. I, supra, pág. 84; Bayrón Toro v. Serra, 119 D.P.R. 605 (1987).
Conforme lo anterior, y luego de hacer un análisis pon-derado y de aplicar la normativa vigente a las circunstan-cias ante nuestra consideración, resolvimos que el Estado “demostró tener un interés público importante en adoptar medidas correctivas de forma expedita para atender la crisis fiscal en [la] protección del bienestar general de la sociedad”. Domínguez Castro et al. v. E.L.A. I, supra, pág. 88. Concluimos, además, que la Ley Núm. 7, supra, “se adoptó como resultado del ejercicio del poder de razón de Estado para atender una emergencia fiscal que atenta contra el bienestar socioeconómico de la sociedad puertorri-queña”, por lo que las cesantías autorizadas y el procedi-miento establecido por el referido estatuto no infringen la cláusula constitucional que prohíbe el menoscabo de las obligaciones contractuales. íd., págs. 88-89.
*742 Por último, en cuanto a las reclamaciones de los empleados cesanteados sobre la inconstitucionalidad de la Ley Núm. 7, supra, por delegar poderes indebidamente a la Junta de Reestructuración y Estabilización Fiscal (JREF), expresamos que “nada impide que la Legislatura establezca normas generales que sean amplias y que dejen al administrador un adecuado margen de libertad para complementar las normas legislativas mediante la utilización de un juicio especializado”, el cual pueda desarrollarse conforme a un análisis, apreciación y discreción administrativa razonable. Domínguez Castro et al. v. E.L.A. I, supra, pág. 94; Debién v. Junta de Contabilidad, 76 D.P.R. 96 (1954). En ese sentido, añadimos que una delegación de poderes de esta naturaleza será valida
... siempre y cuando la ley habilitadora que crea la agencia u organismo administrativo, establezca normas adecuadas, pau-tas, estándares, criterios, o principios inteligibles o aquellas garantías o salvaguardas procesales y sustantivas que sirvan de guía a la delegación y que delimiten sus facultades, para evitar que las actuaciones de los entes administrativos resul-ten arbitrarias o caprichosas. Dichos criterios no tienen que ser expresos, pueden surgir, inclusive, del historial legislativo y pueden ser amplios y generales .... (Citas omitidas.) Domínguez Castro et al. v. E.L.A. I, supra, pág. 93.
Por ello, luego de exponer y analizar los poderes que la Ley Núm. 7, supra, delegó a la JREF, colegimos que dicha delegación es constitucionalmente válida y no viola el prin-cipio constitucional de separación de poderes. Ello, pues el referido estatuto provee unas guías adecuadas que orien-tan la utilización de ese poder. Domínguez Castro et al. v. E.L.A. I, supra, pág. 97.
Esta normativa jurídica es la que hoy reiteramos. Re-sulta innecesario alterar los pronunciamientos vertidos en Domínguez Castro et al. v. E.L.A. I, supra, máxime cuando los recurridos en los casos aquí consolidados presentaron, en cuanto a las controversias adjudicadas en dicha opinión, los mismos planteamientos constitucionales atendidos en *743 aquella ocasión. Consecuentemente, resta por considerar los planteamientos aquí esbozados y no adjudi-cados en Domínguez Castro et al. v. E.L.A. I, supra.
A. La Sec. 17 del Art. Ill de la Constitución de Puerto Rico, en lo pertinente, establece lo siguiente:
No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido expresado en el título será nula. La ley de presupuesto general sólo podrá con-tener asignaciones y reglas para el desembolso de las mismas. Ningún proyecto de ley será enmendado de manera que cam-bie su propósito original o incorpore materias extrañas al mismo. Const. E.L.A., supra, ed. 2008, pág. 397.
Esta sección establece la llamada “regla de un solo asunto”, la cual exige que toda ley o estatuto que apruebe la Asamblea Legislativa regule una sola materia. Con-forme a esta regla constitucional, el asunto tratado por la ley debe surgir de su título, de lo contrario, la parte de la ley que se omita del título se entenderá nula. Véase Dorante v. Wrangler of P.R., 145 D.P.R. 408, 427 (1998). De igual forma, esta regla exige que toda enmienda a la ley sea afín al asunto regulado. Id.
En Laboy v. Corp. Azucarera Saurí & Subirá, 65 D.P.R. 422 (1945), nos expresamos sobre la “regla de un solo asunto”. En aquella ocasión, mediante la Ley Núm. 26 de 23 de noviembre de 1917, conocida como Ley para Enmen-dar el Artículo 553 del Código Penal, Derogar el Artículo 554 de dicho Código y para Otros Fines, se introdujo una enmienda de naturaleza civil al Código Penal. En especí-fico, la See. 3 de dicha ley indicaba lo siguiente:
Los empleados y dependientes de las empresas y estableci-mientos no exceptuados por esta Ley, que presten sus servicios sobre la base de un salario anual, mensual, semanal o en cual-quier otra forma que no sea por jornal o ajuste a un tanto alzado, tendrán derecho a un día de descanso por cada seis de *744 trabajo, con salario íntegro. Laboy v. Corp. Azucarera Saurí & Subirá, supra, pág. 429.
De acuerdo con la referida sección, el Sr. José La-boy Montes y el Sr. Juan Laboy Montes presentaron un recurso de apelación en el que adujeron que su patrono, la Corporación Azucarera Saurí & Subirá, no les había honrado los derechos que otorgó esta disposición. Ante estas alegaciones, al exponer la normativa sobre la “regla de un solo asunto”, expresamos que “el precepto constitucional... ‘requiere que el asunto de una ley sea claramente expresado en el título ...’ ”. Laboy v. Corp. Azucarera Saurí & Subirá, supra, pág. 425. Ello es así debido a que el título de una ley “ ‘tiene por objeto informar al público en general y a los legisladores en particular, el asunto que es objeto de la ley, de forma que el primero pueda oponerse a su aprobación si la considera lesiva a sus intereses y los segundos estén en condiciones de emitir su voto conscientes del asunto objeto de legislación’ ”. Id., págs. 425-426.
En apoyo de nuestras expresiones sobre la “regla de un solo asunto”, señalamos que en Martinez v. People of Porto Rico, 46 F.2d 427, 429 (1er Cir. 1931), el Tribunal Federal de Apelaciones para el Primer Circuito indicó que no debía entenderse como que “ ‘el título debe contener una minu-ciosa descripción de la ley. Basta que exprese en términos generales cuál es su objeto, Rodríguez v. P.R. Ry., Lt. & Power Co., 30 D.P.R. 931 [(1922)], siempre que, desde luego, no induzca a error. [E]l título debe ser un “poste indicador” de lo que contiene la ley’ ”. Laboy v. Corp. Azucarera Saurí & Subirá, supra, pág. 426. Véase, además, Posados v. Warner, B. & Co., 279 U.S. 340 (1929).
Así, pues, al analizar integralmente el título de la Ley Núm. 26, supra, su See. 3 y el cuerpo normativo en donde se insertó dicha enmienda, resolvimos que el asunto regu-lado por la referida sección era de carácter puramente civil y “[constituía] una desviación del asunto de la ley original”. *745 Laboy v. Corp. Azucarera Saurí & Subirá, supra, pág. 430. Por ello la declaramos nula.
[Q]uien lee el título de la Ley Núm. 26 de 23 de noviembre de 1917, difícilmente podrá sospechar que a un artículo del Có-digo Penal se le haya adicionado una materia de naturaleza estrictamente civil. El título de la Ley de 1917 en ninguna forma indica que fuera el objeto de la enmienda que el patrono concediese a su empleado un día de descanso con salario ínte-gro por cada seis de trabajo. Laboy v. Corp. Azucarera Saurí & Subirá, supra, pág. 429.
Recientemente, en Herrero y otros v. E.L.A., 179 D.P.R. 277 (2010), nos expresamos ampliamente sobre la “regla de un solo asunto” y expusimos su trayectoria. En esta oca-sión estaba en controversia la validez constitucional de una cláusula contenida en la Ley Núm. 42 de 1 de agosto de 2005, mediante la cual se sujetó la efectividad de dicha ley a la aprobación de la Resolución Conjunta Núm. 445 sobre el Presupuesto General 2005-2006.
En específico, en cuanto a la trayectoria de la regla, se-ñalamos que fue introducida en Puerto Rico “por el Artí-culo 34 de la Carta Orgánica Jones de 1917, como parte del detallado proceso legislativo incluido en dicha ley” y que su propósito es impedir prácticas fraudulentas, facilitar la labor legislativa y hacer imposible que grupos minoritarios incorporen sus proposiciones favoritas en una sola pieza de legislación y se unan para obtener una mayoría artificial, la cual no existiría si las distintas proposiciones se consi-deraran separadamente. Véanse: Herrero y otros v. E.L.A., supra, pág. 292, citando a J. Trías Monge, Historia Consti-tucional de Puerto Rico, San Juan, Ed. Universidad de Puerto Rico, 1982, Vol. III, pág. 159; Escuela de Adminis-tración Pública, La Nueva Constitución de Puerto Rico, (edición facsimilar de la primera edición 1954), San Juan, Ed. Universidad de Puerto Rico, 2005, págs. 402-404; 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2584 (1961). Además, indicamos que la “regla de un solo asunto” se incorporó en la Constitución de *746 Puerto Rico para prevenir las concesiones mutuas en la aprobación de las leyes o el llamado “logrolling”,(31) y que esta práctica “contraviene el diseño legislativo ya que cada una de las propuestas independientes probablemente no lograrían una mayoría legislativa por méritos propios”. He-rrero y otros v. E.L.A., supra, pág. 293. Cónsono con lo anterior, expresamos que el logrolling se puede manifestar a través de los llamados “riders”,(32) y que la “regla de un solo asunto” está “encaminada a evitar los riders, a evitar que se hagan enmiendas extrañas al propósito de los proyectos y que se adultere el fin de un proyecto aprobando subrep-ticiamente algo que la Asamblea Legislativa no dejaba aprobar, no debió haber permitido que se aprobara de ha-ber conocido la intención”,(33) Id., pág. 294. Véase 2 Diario de Sesiones de la Convención Constituyente 896 (1961).
Por su parte, en cuanto a la relación directa exi- *747 gida por la “regla de un solo asunto”, y que debe existir entre el título de una ley y el asunto que regula, señalamos que en múltiples ocasiones hemos resuelto que el propósito de esta relación “es informar al público en general y a los legisladores en particular del asunto del cual es objeto la ley, de manera que se impida la inclusión de materia in-congruente y extraña”. (Enfasis nuestro.) Herrero y otros v. E.L.A., supra, pág. 295. Véanse: Dorante v. Wrangler of P.R., supra; Cervecería Corona, Inc. v. Junta de Salario Mínimo, 98 D.P.R. 801 (1970). Aclaramos que dicha regla no “ ‘requiere que el título constituya un índice detallado del contenido de la ley, sino meramente que sea un hito indicador del asunto cubierto por la misma’ ”. Herrero y otros v. E.L.A., supra, pág. 295. Véanse: Pueblo v. Pérez Méndez, 83 D.P.R. 228, 230 (1961), citando a Sunland Biscuit Co. v. Junta Salario Mínimo, 68 D.P.R. 371, 380 (1948); Rodríguez v. Corte, 60 D.P.R. 919, 922 (1942). Véanse, además: Laboy v. Corp. Azucarera Sauri & Subirá, supra, pág. 426; Rodríguez v. P.R. Ry., Lt. & Power Co., supra; Martinez v. People of Porto Rico, supra.
*746 “... que escoger entre aprobar una ley necesaria para el funcionamiento del gobierno, la cual incluye una disposición incongruente con el asunto principal de la ley y que desfavorece, o vetar la ley en su totalidad. El ejemplo por antonomasia de una ley susceptible de que le sean añadidos ‘riders’ es la Resolución del Presupuesto General, pues la aprobación de ésta es necesaria para el funcionamiento de todas las dependencias del gobierno, por lo que generalmente es aprobada. Es por esta razón que en Puerto Rico, y en varios estados de Estados Unidos, existe una disposición específica que establece que, aun cuando la medida del Presupuesto puede [versar] sobre varios asuntos, sólo puede contener asignaciones de fondos y reglas para su desembolso.” Herrero y otros v. E.L.A., supra, pág. 294. Véanse, además: Art. III, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1; El Pueblo v. Foote, Juez, 48 D.P.R. 492 (1935).
*747 En ese sentido, apuntalamos que la “regla de un solo asunto” no está diseñada
... como subterfugio para destruir legislación válida, sino como garantía de que el proceso legislativo se realice de forma transparente, de manera que cada proyecto de ley se discuta y se analice a cabalidad antes de ser aprobado.
Por lo tanto, al examinarse la validez de una ley a [la luz de] la regla de un sólo asunto, es necesario auscultar todas sus dis-posiciones para determinar si éstas se relacionan entre sí y son afines con el asunto que se expresa en su título. Cervecería Corona Inc. v. J.S. M., supra, pág. 812. Lo que comprende “un sólo asunto” se interpreta liberalmente, sin dejar de lado el propósito y objetivo de la exigencia constitucional. En ese tenor, “[u]n estatuto puede comprender todas las materias afi-nes al asunto principal y todos los medios que puedan ser jus-tamente considerados como accesorios y necesarios o apropiados para llevar a cabo los fines que están propiamente comprendidos dentro del asunto general”. Herrero y otros v. E.L.A., supra, págs. 295-296, citando a R.E. Bernier y J.A. *748 Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed., San Juan, Pubs. J.T.S., 1987, pág. 81.
Acorde con lo anterior, resolvimos que la cláusula con-tenida en la Ley Núm. 42, supra, mediante la cual se con-dicionó la efectividad de dicha ley a la aprobación posterior de la Resolución Conjunta Núm. 445 sobre el Presupuesto General 2005-2006, era constitucionalmente válida, pues la Asamblea Legislativa posee la facultad inherente de su-jetar la validez de un estatuto a una condición o un evento futuro.(34) Herrero y otros v. E.L.A., supra, pág. 299. “Dicha condición puede tratarse de una contingencia, tal como el resultado de una elección, la aprobación de una enmienda constitucional, o la aprobación de otra ley.” Id.
Nuestra decisión estuvo basada en la interdependencia habida entre ambas piezas legislativas y la relación directa de los asuntos regulados. Herrero y otros v. E.L.A., supra, pág. 301. No obstante, aclaramos que la potestad de la Asamblea Legislativa para condicionar leyes no es irrestricta. Así, “una condición que sujete la vigencia [de una ley] a una contingencia que sea extraña o no esté razonablemente relacionada con la ley en cuestión, podría violar la regla de un solo asunto”. (Enfasis nuestro.) Id., pág. 300.
B.
Las leyes deben interpretarse de acuerdo con reglas bien co-nocidas, que [a] veces se llaman ‘cánones de interpretación’ con respecto [a] los cuales se han escrito tomos enteros, y jue-ces competentes han trabajado día y noche, preparando cente-nares de dictámenes y explicándolos y comentándolos. Una de las primeras y más importantes de todas estas reglas, es de averiguar y cerciorarse de la intención de la legislatura y se-guir dicha intención. ... Por supuesto, si los tribunales [o] jue-ces no se fijan en el sentido de la ley, ni prestan atención al texto del estatuto, entonces no pueden ver la intención de la *749 legislatura. Pero muchas veces dicha intención les salta [a] la vista, cuando puede verse claramente, simplemente mirando. Los tribunales no deben nunca dar [a] una ley una interpreta-ción forzada [o] desnatural, si es posible evitarlo. Es fácil ha-cer desparecer la intención de la legislatura, mediante una refinada interpretación, [o] anular las claras disposiciones de una ley, mediante cavilaciones hechas con ese fin. Pero, los tribunales y los jueces deberían evitar tales prácticas, em-pleando para ello todos los medios posibles. Theodore Roosevelt expresa la opinión general del público con respecto [a] esta cuestión, en las siguientes enérgicas palabras: Una exa-gerada sutileza en las decisiones, puede dar por resultado el mismo daño para la comunidad, como si el juez fuese real-mente depravado. (Citas omitidas.) El Pueblo v. Ferraris, 15 D.P.R. 813, 834-835 (1909), voto particular del Juez MacLeary.
El lenguaje claro y explícito de un estatuto no se debe tergiversar, mucho menos malinterpretar o sustituir. La función de la Rama Judicial no es legislar, sino interpretar las leyes que aprueba la Rama Legislativa y constatar que no estén reñidas con la Constitución. Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803). Véanse: Art. V, Sec. 4, Const. E.L.A., supra; E.L.A. v. Aguayo, 80 D.P.R. 552, 595—602 (1958); Marimón vs. Pelegrí, 1 D.P.R. 225, 229 (1902).
Para cumplir cabalmente con la tarea antes mencio-nada, la cual encuentra sus orígenes en uno de los pilares de todo sistema republicano de gobierno —la Separación de Poderes— el legislador ha consagrado en nuestro orde-namiento jurídico ciertas normas o reglas de inter-pretación. Es aquí donde el Art. 14 del Código Civil, 31 L.P.R.A. sec. 14, juega un papel medular, pues es uno de los postulados básicos de la hermenéutica judicial.
El principio de hermenéutica contenido en el Art. 14 de nuestro Código Civil, supra, enuncia que “[c]uando la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir con su espíritu”. Este principio nace de la “regla de oro” en la interpretación estatutaria: buscar y poner en vigor la inten- *750 ción legislativa. Véanse: Mason v. White Star Bus Line, 53 D.P.R. 337, 340 (1938); El Pueblo v. Del Moral et al., 16 D.P.R. 653, 655 (1910); Vivaldi v. Mariani et al., 10 D.P.R. 444, 446-447 (1906); Bernier y Cuevas Segarra, op. cit., Vol. I, pág. 267.
En armonía con lo anterior, en un sinnúmero de ocasiones hemos indicado que "ante el lenguaje claro, ex-plícito y libre de toda ambigüedad o duda de un estatuto, no cabe menospreciar la letra de la ley bajo el pretexto de cumplir su espíritu, máxime cuando el espíritu o intención del estatuto y su letra son la misma cosa”. Pueblo v. Castro Muñiz, 118 D.P.R. 625, 650 (1987). Véase Román v. Superintendente de la Policía, 93 D.P.R. 685, 688 (1966). Véanse, además: Rullán Rivera v. A.E.E., 179 D.P.R. 433 (2010); Garriga Villanueva v. Mun. de San Juan, 176 D.P.R. 182 (2009); Villamil Development v. C.R.I.M., 171 D.P.R. 392 (2007); Muñoz v. Ten General, 167 D.P.R. 297 (2006); López v. Secretaria, 162 D.P.R. 345 (2004); Pueblo v. Álvarez Rodríguez, 154 D.P.R. 566 (2001); Santiago v. Supte. Policía de P.R., 151 D.P.R. 511 (2000); Rodríguez v. Aut. de Tel. de P.R., 145 D.P.R. 595 (1998); Gobernador de P.R. v. Alcalde de Juncos, 121 D.P.R. 522 (1988); Municipio de Mayagüez v. Rivera, 113 D.P.R. 467 (1982). Ahora bien, para propiciar el resultado que desea el legislador, la exégesis judicial no se debe circunscribir al examen aislado de una sola dispo-sición legal. Por el contrario, el análisis se debe hacer con-siderando la totalidad del estatuto y su contexto.
Téngase en cuenta, que la intención legislativa de mía ley no debe buscarse en una frase aislada o en una de sus secciones; sino en el contexto de todo el estatuto, tomando en cuenta el propósito seguido por el legislador. Por eso, un artículo de una ley no debe interpretarse aisladamente, sino considerando la ley en su totalidad. Bernier y Cuevas Segarra, op. cit., pág. 245.
Sin embargo, si la aplicación literal de un esta- *751 tuto nos lleva a un resultado absurdo o a un resultado opuesto a la verdadera intención o propósito del legislador, la literalidad se puede ignorar. Morell et al. v. Ojeda et al., 151 D.P.R. 864, 877-878 (2000); Clínica Juliá v. Sec. de Hacienda, 76 D.P.R. 509, 520 (1954). Siendo así, cuando existan disposiciones dudosas en un estatuto, éstas deben interpretarse a la luz de las demás disposiciones y atribuir-les el sentido que resulte del conjunto de todas. Departa-mento de Hacienda v. Telefónica, 164 D.P.R. 195 (2005). Véanse, además: Ojeda v. El Vocero de P.R., 137 D.P.R. 315, 335 (1994); Alvarez & Pascual, Inc. v. Srio. Hacienda, 84 D.P.R. 482, 489-490 (1962); Pueblo v. Sucn. Junghanns, 73 D.P.R. 648, 652-653 (1952).
Así, pues, un buen ejemplo de la normativa antes esbo-zada y del análisis concienzudo que debe emplearse a la hora de identificar e implementar la intención legislativa plasmada en un estatuto lo encontramos en Comisionado Seguros P.R. v. Integrand, 173 D.P.R. 900 (2008). En aque-lla ocasión, nos vimos precisados a interpretar el alcance del Art. 2.220 del Código de Seguros, 26 L.P.R.A. sec. 222, para determinar si la Oficina del Comisionado de Seguros estaba obligada a celebrar una vista cuando una parte afectada por una orden emitida previamente por dicha ofi-cina así lo solicitaba.
Luego de analizar el lenguaje utilizado en el Art. 2.220 del Código de Seguros, supra,(35) y el contexto en el que se *752 adoptó, resolvimos que dicho articulado no exigía ni obli-gaba la celebración de una vista, según alegaban los peticionarios. Al así hacerlo, señalamos que
[a]l interpretar el enunciado general de este artículo, lo debe-mos hacer en armonía con las disposiciones de los incisos posteriores. Por eso, aun cuando el enunciado general esta-blece que el Comisionado “celebrará las siguientes” vistas, lo que parece ser un mandato, tma vez evaluada esta disposición en conjunto con los incisos posteriores que la modifican!,] ad-vertimos que lo que parecía ser obligatorio, no lo es. Nos explicamos.
En primer lugar, el inciso 1(a) del Artículo 2.220 regula las “vistas requeridas” por disposición del Código de Seguros. Este inciso hace obligatoria la celebración de una vista cuando al-guna disposición del Código de Seguros ordena celebrar vistas. Dicho inciso claramente alude a vistas “requeridas” por el estatuto. Adviértase sin embargo, que es el adjetivo “requeri-das” contenido en el inciso 1(a) el que establece la obligatorie-dad de la celebración de dichas vistas, y no la palabra “cele-brará” contenida en el enunciado general.
Por otro lado, las vistas a las que se refiere el inciso 1(b) son discrecionales. Lo que disipa las dudas en cuanto a la discre-ción del Comisionado para celebrarlas es que el inciso particular establece claramente que se refiere a las vistas “considera-das necesarias por el Comisionado”.
En otras palabras, los incisos (a) y (b) del Artículo 2.220 regu-lan dos clases de vistas. La primera (Artículo 2.220(a)) es una vista de carácter obligatorio ordenada por el propio Código de Seguros en otras de sus disposiciones. El segundo tipo de vistas (Artículo 2.220(b)), es una vista discrecional, cuya celebra-ción dependerá de la determinación que haga el propio Comi-sionado sobre si es o no conveniente llevarla a cabo. La celebración de estas vistas se enmarca en el ejercicio de la discreción de este funcionario. (Escolio omitido.) Comisionado Seguros P.R. v. Intergrand, supra, págs. 910-911.
Otro ejemplo reciente de la exégesis judicial antes des-crita lo encontramos en Medina Sánchez v. Swiss Chalet, 178 D.P.R. 363 (2010). En esta ocasión tuvimos que deter- *753 minar si al amparo de la Ley Núm. 130(36) y el Reglamento del Negocio de la Construcción,(37) el Departamento de Asuntos del Consumidor (D.A.Co.) tiene jurisdicción para ordenarle a una desarrolladora que indemnice a un com-prador de un apartamento por la disminución en la cabida del mismo. Ello, pues los documentos de promoción y la escritura de compraventa reflejaban una cabida mayor a la que finalmente tasó la propiedad.
Al resolver la controversia examinamos el lenguaje en los Artículos 10(c)(6), 10(h)(1) y 11, de la Ley Núm. 130, supra, 17 L.P.R.A. secs. 510(c)(6), 510(h)(1) y 511, y en las Secciones 14.13, 15 y 20 del Reglamento del Negocio de la Construcción, supra. Concluimos que estas disposiciones legales específicamente facultan a D.A.Co. con jurisdicción para atender las querellas presentadas por compradores contra desarrolladores en las cuales se alegue haber su-frido daños y peijuicios por defectos de construcción o por la falsa representación sobre la unidad vendida. Medina Sánchez v. Swiss Chalet, supra, págs. 371-373. Incluso, al atender las alegaciones de la recurrida sobre lo adecuado del término “aproximada”, contenido en el folleto promocio-nal del proyecto, examinamos su significado según lo define el Diccionario de la Lengua Española de la Real Academia Española, y resolvimos que “el área neta habitable de 950 pies cuadrados no es aproximada a un área de 1,022 pies cuadrados” y que se trataba de “una diferencia de 72 pies cuadrados, lo cual no corresponde a lo que una persona promedio entendería que 'se acerca más o menos a’ 1,022 pies cuadrados”. Medina Sánchez v. Swiss Chalet, Inc., supra, pág. 372.
Por último, al disponer del asunto, señalamos que “la *754 táctica de tergiversar las cabidas de los apartamentos que están a la venta constituye una práctica nociva para la industria de la construcción en Puerto Rico, pues resulta perjudicial para los compradores que adquieren una pro-piedad confiando en lo que el desarrollador les señala” y que dicha práctica se ejercía “amparándose en una inter-pretación acomodaticia de la Ley de Condominios”.(38) Medina Sánchez v. Swiss Chalet, Inc., supra, pág. 373.
C. El procedimiento para implementar el plan de cesantías adoptado por la Ley Núm. 7, supra, se encuentra en el Art. 37.04(b) del referido estatuto. Por su importancia, lo transcribimos en su totalidad.

Artículo 37.04. -Procedimiento.

(b) Cesantías.
(1) En vista del estado de emergencia fiscal, la escasez de recursos fiscales, la gravedad de los problemas que enfrenta-mos y la urgencia requerida para corregir los problemas fisca-les, se exime de agotar medidas tales como reubicación de personal, readiestramiento de empleados, disfrute de vacaciones acumuladas, disfrute de licencia sin sueldo, reducción de jor-nada de trabajo o descensos, previo a instrumentar las cesantías.
(2) Las Agencias notificarán la terminación a todo em-pleado que a la fecha de la vigencia de esta Ley tenga un nombramiento transitorio o irregular, por lo que no será nece-sario observar, en cuanto a éstos, el criterio de antigüedad. La notificación escrita que a esos efectos las Agencias envíen, le apercibirá al empleado de su derecho de solicitar revisión de la decisión de la Agencia, ante la CASARH, en conformidad a lo dispuesto por el Artículo 13, sección 13.14, de la Ley Núm. 184 del 3 de agosto de 2008[sic], y su reglamento. La notificación se hará mediante entrega a la mano o por correo certificado con acuse de recibo a la dirección que obra en los expedientes de la Agencia.
(3) Las cesantías de los empleados con nombramiento per-manente o de carrera se efectuarán observando exclusiva-mente el criterio de antigüedad, de modo que sean cesan- *755 teados en primer término aquellos que tengan menor antigüedad.
(4) A los fines de determinar la antigüedad de empleados afectados se considerarán todos los servicios prestados por los empleados afectados en el servicio público, independiente-mente de las disposiciones de los convenios colectivos, regla-mentos, cartas circulares y otros documentos normativos.
(5) Se crea la JREF, la cual estará compuesta por el Pre-sidente del BGF, el cual dirigirá la Junta, el Secretario del Trabajo, el Secretario del Departamento de Desarrollo Econó-mico y Comercio de Puerto Rico, el Secretario del Departa-mento de Hacienda, y la Directora Ejecutiva de la OGP. Sus miembros, en el desempeño de esta encomienda, no habrán de recibir remuneración adicional a la que reciben por el desem-peño de sus labores en sus agencias o departamentos.
(6) Además de las facultades otorgadas por este Capítulo III, la JREF tendrá todas las facultades necesarias y conve-nientes para descargar la encomienda aquí asignada, inclu-yendo pero sin limitarse a la de realizar o encomendar, a las agencias o departamentos que están a su cargo, que se reali-cen los estudios que sean necesarios; requerir a las Agencias la información necesaria para realizar su encomienda; asesorar al Gobernador y a las Agencias en todo lo relativo a los em-pleados a ser cesanteados; evaluar, aprobar o rechazar peticio-nes de empleados para reducir la jornada de los puestos que ocupan; llevar a cabo reuniones entre sí y con los jefes de las Agencias; y reclutar de forma temporal, mediante destaque, el personal necesario para realizar la encomienda. Su Presidente tendrá la facultad, además, para asignar y/o poner a la dispo-sición de la JREF todo recurso del BGF que sea necesario para descargar sus obligaciones bajo este Capítulo III. La enco-mienda de la JREF, y su duración finalizará una vez se cum-pla el objetivo de la ley.
(7) La JREF habrá de determinar la cantidad global de empleados a ser cesanteados, en conformidad con las disposi-ciones del Artículo 2 de esta Ley y en armonía con la necesidad de asegurar la continuidad y calidad de los servicios guberna-mentales, dentro de un término no mayor de cinco (5) días calendario de iniciada la Fase II.
(8) Las Agencias identificarán y certificarán a la JREF la antigüedad de cada uno de sus empleados, dentro de un tér-mino no mayor de quince (15) días calendario de iniciada la Fase II.
En el mismo término, las Agencias certificarán por escrito a sus empleados afectados, individualmente, su fecha de anti- *756 güedad según surge de sus récords. En el caso de empleados miembros de una unidad apropiada representada por una or-ganización sindical se notificará, además, a dicha organiza-ción sindical. Dicha certificación se notificará a los empleados, y, además, de ser el caso, a la organización sindical, mediante entrega a la mano o por correo certificado con acuse de recibo, a la dirección que obra en los expedientes de las Agencias y apercibiéndole del derecho que tiene el empleado a exponer y fundamentar por escrito su versión en cuanto a su fecha de antigüedad. La fecha de notificación será la de su entrega o envío.
(9) El empleado, y de ser el caso, éste a través de su orga-nización sindical, tendrá un término no mayor de treinta (30) días calendario, a partir de la fecha de la notificación, para presentar por escrito a la Agencia, evidencia documental ofi-cial emitida por la autoridad o entidad gubernamental compe-tente (“evidencia documental fehaciente”) que refute la anti-güedad que le ha sido certificada. Para ello utilizará el formulario que para esos fines será provisto por su respectiva Agencia, el cual completará y someterá a su propia Agencia, con copia de la evidencia documental fehaciente que refute la fecha de antigüedad notificada por la Agencia.
(10) En la eventualidad de que el empleado afectado no refute o no presente, dentro del término aquí dispuesto, evi-dencia documental fehaciente que sostenga su posición, la an-tigüedad a ser utilizada será aquella que le fue notificada por la Agencia. Dicha antigüedad será concluyente para todo pro-pósito relacionado con este Capítulo III.
(11) En la eventualidad de que el empleado afectado pre-sente, dentro del término aquí dispuesto, evidencia documen-tal fehaciente que controvierta la antigüedad que le ha sido notificada, la Agencia no tomará determinación final sobre la antigüedad sin antes darle la oportunidad de tener una vista previa.
(12) La Agencia notificará al empleado su determinación final que sobre la antigüedad tome, y, además, de ser el caso, a la organización sindical, en un término no mayor de treinta (30) días calendario, apercibiéndole de su derecho de solicitar revisión de dicha determinación, conforme a lo dispuesto a esos fines en [los incisos] (13) y (14), del Artículo 37.04(b) de esta Ley. Dicha notificación se hará a los empleados, y, ade-más, de ser el caso, a la organización sindical, mediante en-trega a la mano o por correo certificado con acuse de recibo, a la dirección que obra en los expedientes de las Agencias. La fecha de notificación será la de su entrega o envío. No obs- *757 tante, la presentación del recurso de revisión no habrá de pa-ralizar las cesantías; disponiéndose, no obstante, que en el caso que el empleado prevalezca, se le restituirá a su puesto, efectivo a la fecha de su cesantía.
(13) El empleado afectado podrá solicitar revisión de la determinación final tomada por la Agencia, solamente en cuanto a su antigüedad ante la CASARH, en conformidad a lo dispuesto por el Artículo 13, sección 13.14, de la Ley Núm. 184 del 3 de agosto de 2004, y su reglamento.
(14) Aquellos empleados que sean miembros de una uni-dad apropiada, afiliados o no a una organización sindical, po-drán revisar la determinación [final tomada] por la Agencia, solamente en cuanto a su antigüedad, mediante una petición que a esos efectos presenten a los árbitros de la Comisión, creada al amparo de la Ley Núm. 45 del 25 de febrero de 1998, en un término no mayor de treinta (30) días calendario del recibo de la notificación de la Agencia.
(15) La Agencia notificará las cesantías con al menos treinta (30) días calendario de anticipación a la fecha de su efectividad, mediante comunicación escrita dirigida al em-pleado y, además, de ser el caso, a la organización sindical, indicando la fecha de efectividad de la misma. La notificación se realizará conforme al Artículo 37.04(b), inciso (12) de este Capítulo III.
(16) Las cesantías a efectuarse conforme a esta Fase II serán llevadas a cabo de forma escalonada, a partir del 1 de julio del 2009 y durante todo el año fiscal 2009-2010. La JREF establecerá el orden en que se llevarán a cabo las cesantías y al determinar este orden tomará en cuenta las medidas nece-sarias para asegurar que las Agencias afectadas puedan con-tinuar operando apropiadamente luego de las cesantías.
(17) El hecho de que algún empleado afectado haya pre-sentado, en fecha anterior a la fecha de efectividad de esta Ley, alguna querella, reclamación o impugnación cuestio-nando su clasificación, no será obstáculo para decretar su ce-santía haciendo uso de la clasificación objetada o impugnada. No obstante, de resolverse tal querella, reclamación o impug-nación de forma favorable al empleado y, por consiguiente, cambie su clasificación a una en la cual lleve a cabo funciones esenciales conforme a lo dispuesto en el Artículo 37.02, la Agencia dejará sin efecto su cesantía, retroactivo a la fecha de su cesantía.
El Art. 37.04(b) de la Ley Núm. 7, supra, contempla, a través de sus diecisiete subincisos, los requisitos de notifi- *758 cación con los cuales tienen que cumplir todas las cesantías decretadas de acuerdo con dicho estatuto.
En cuanto a la terminación de empleados cuyo nombra-miento a la fecha de vigencia de la Ley Núm. 7, supra, era de carácter transitorio o irregular, el subinciso (2) del Art. 37.04(b) de este estatuto dispone, primeramente, que no es necesario observar el criterio de antigüedad. A renglón se-guido, señala que la carta de cesantía debe apercibirle al empleado sobre su derecho a solicitar revisión de la deci-sión de la agencia ante la Comisión Apelativa del Sistema de Administración de Recursos Humanos (CASARH) y que dicho apercibimiento se debe hacer según lo dispuesto en el Art. 13, Sec. 13.14, de la Ley Núm. 184 de 3 de agosto de 2004 (3 L.P.R.A. sec. 1468m), y su reglamento. Esta carta de cesantía se notificará personalmente o por correo certi-ficado con acuse de recibo a la dirección que obra en los expedientes de la Agencia. Art. 37.04(b)(2) de la Ley Núm. 7, supra.
Por su parte, en cuanto a las cesantías de los empleados de carrera, el subinciso (3) del Art. 37.04(b) de la Ley Núm. 7, supra, indica que éstas se efectuarán observando el cri-terio de antigüedad, de modo que sean cesanteados —en primer término— aquellos empleados de menor antigüedad. Asimismo, el subinciso (15) del Art. 37.04(b) del referido estatuto dispone que la agencia tiene que in-formar los despidos con al menos treinta (30) días de anti-cipación a la fecha en que éstos serán efectivos. Esta deci-sión de la agencia se informará mediante comunicación escrita dirigida al empleado y, además, a la organización sindical que lo representa. A su vez, la referida misiva con-tendrá la fecha de efectividad del despido y un apercibi-miento sobre su derecho a solicitar una revisión de la deci-sión de la agencia ante la CRTSP. Art. 37.04(b)(12) y (14) de la Ley Núm. 7, supra. Esta carta de cesantía también se notificará personalmente o por correo certificado con acuse de recibo a la dirección que obra en los expedientes de la *759 agencia y su fecha de notificación será la de su entrega o envío. Art. 37.04(b)(12) de la Ley Núm. 7, supra.
Como podemos observar, del anterior párrafo se deducen los requisitos exigidos para las cesantías de los empleados de carrera decretadas en virtud de la Ley Núm. 7, supra. Así, los incisos (12) y (15) del Art. 37.04(b) de la Ley Núm. 7, supra, exigen lo siguiente: (1) que la cesantía decretada por la agencia se informe mediante comunicación escrita, y (2) que esta comunicación escrita: (a) se le remita al empleado cesanteado con al menos treinta días de anticipación a la fecha de efectividad de su despido; (b) le informe al empleado la fecha cuando su despido será efectivo, y (c) le aperciba al empleado sobre su derecho a solicitar revisión de la decisión de la agencia.
Además, en las instancias en que el empleado de ca-rrera despedido esté representado por una organización sindical, a ésta se le informará de la cesantía mediante una comunicación escrita, aparte de la misiva enviada al empleado despedido, y su contenido deberá reflejar la in-formación que requiere el Art. 37.04(b) de la Ley Núm. 7, supra.(39) En ese caso, el apercibimiento sobre el derecho a solicitar revisión descrito en el párrafo anterior deberá in-dicar que el foro apropiado para ejercer este derecho es la CRTSP.(40) Por consiguiente, toda carta de cesantía notifi-cada en detrimento de los requisitos antes esbozados será defectuosa.
Ahora bien, en materia de notificaciones defectuosas, Mólini Gronau v. Corp. P.R. Dif. Púb., 179 D.P.R. 674 (2010), resulta altamente importante. Allí detallamos el re- *760 medio al que tiene derecho una parte que ha sido notifi-cada de su cesantía defectuosamente.
En aquella ocasión, luego de que se le notificara su ce-santía mediante comunicación escrita, la peticionaria pre-sentó una demanda sobre interdicto preliminar y perma-nente, sentencia declaratoria y compensación por daños y perjuicios ante el Tribunal de Primera Instancia. En su demanda la peticionaria alegó que el plan de cesantías im-plementado por la Corporación violaba los postulados del debido proceso de ley, el principio de mérito y otros dere-chos reconocidos por el Reglamento de la Corporación. Por su parte, la Corporación adujo que el foro con jurisdicción para atender la controversia instada era su Comité de Ape-laciones y no el tribunal de instancia. Ello, pues la decisión de implementar el plan de cesantías la decretó el Presi-dente de la Corporación y no su Junta de Directores. Molini Gronau v. Corp. P.R. Dif. Púb., supra, pág. 677.
Evaluados los argumentos de ambas partes, el Tribunal de Primera Instancia dictó una sentencia en la cual declaró “con lugar” el interdicto solicitado. Señaló, primeramente, que la decisión de implementar el plan de cesantías la tomó la Junta de Directores de la Corporación y que ello implicaba que el foro con jurisdicción para atender la con-troversia era el judicial y no el Comité de Apelaciones de la Corporación, como se había notificado a la peticionaria en la carta de cesantía. A raíz de ello, el foro primario enten-dió que la carta de cesantía se notificó defectuosamente y dejó sin efecto el despido de la peticionaria sin adjudicar los méritos de las alegaciones vertidas en la demanda. Molini Gronau v. Corp. P.R. Dif. Púb., supra, pág. 679.
Inconforme, la Corporación acudió ante el Tribunal de Apelaciones y reprodujo las alegaciones que presentó ante el Tribunal de Primera Instancia. En la alternativa, alegó que el foro primario erró al dictar sentencia y dejar sin efecto las cesantías decretadas, pues lo que procedía era atender los méritos de la demanda y no la revocación au- *761 tomática de los despidos. Molini Gronau v. Corp. P.R. Dif. Púb., supra, pág. 679.
Posteriormente, el Tribunal de Apelaciones dictó sen-tencia y revocó el dictamen que emitió el Tribunal de Pri-mera Instancia. Concluyó que la cesantía de la peticionaria la decretó el Presidente de la Corporación, por lo que el foro con jurisdicción para revisar la decisión de despido era el Comité de Apelaciones de la Corporación y no el tribunal de instancia. Además, en equidad, el foro apelativo inter-medio le otorgó un término de treinta días a la peticionaria para que acudiera ante el referido Comité, los cuales co-menzarían a contar desde que se notificara la sentencia del foro apelativo intermedio. Molini Gronau v. Corp. P.R. Dif. Púb., supra, págs. 679-680.
Insatisfecha, la peticionaria acudió ante este Tribunal. En su recurso de certiorari, al cual acompañó con una mo-ción en auxilio de jurisdicción, la peticionaria alegó que el Tribunal de Apelaciones erró al revocar el interdicto conce-dido por el Tribunal de Primera Instancia. Luego de eva-luar las posiciones de ambas partes, señalamos que el plan de cesantías se implemento luego de una decisión de la Junta de Directores de la Corporación y no de su Presi-dente, por lo que el foro con jurisdicción para atender la controversia presentada era el judicial y no el Comité de Apelaciones de la Corporación. Molini Gronau v. Corp. P.R. Dif. Púb., supra, pág. 680.
Como consecuencia de lo anterior, resolvimos que la carta de cesantía cursada a la peticionaria constituyó una notificación defectuosa, pues le informó erróneamente que el foro con jurisdicción para revisar su despido era el Co-mité de Apelaciones de la Corporación. Molini Gronau v. Corp. P.R. Dif. Púb., supra, pág. 685. Sin embargo, debido a que la peticionaria acudió oportunamente ante el foro con jurisdicción para adjudicar sus reclamos —el Tribunal de Primera Instancia— añadimos que el foro primario in-cidió al decretar nula la cesantía notificada defectuosa- *762 mente y conceder el interdicto solicitado sin haber aten-dido los méritos de la demanda presentada. Por ello, devol-vimos el caso para que adjudicara la controversia en su totalidad. íd., pág. 687.
Así, pues, conforme a la norma pautada en Molini Gronau v. Corp. P.R. Dif. Púb., supra, en las instancias en que las cartas de cesantía se notifiquen defectuosamente, el remedio a otorgarse es el siguiente: la parte perjudicada podrá ejercer su derecho de revisión ante el foro con jurisdicción para ello, sin sujeción a los términos aplicables. En estas instancias, la parte perjudicada por la notificación defectuosa estará sujeta a la doctrina de incuria,(41) por lo que deberá ejercer su derecho diligentemente, íd., págs. 685-687.
Por el contrario, cuando la parte notificada defectuosa-mente de su cesantía haya presentado oportunamente su recurso de revisión ante el Tribunal de Primera Instancia, éste no podrá invalidar ipso facto la cesantía que decretó la agencia como tampoco podrá conceder automáticamente el remedio solicitado. Más bien, deberá atender los méritos de la reclamación presentada y hacer una adjudicación del derecho sustantivo. Molini Gronau v. Corp. P.R. Dif. Púb., supra, pág. 688.
D. Mediante la Ley Núm. 43 de 21 de junio de 1988, según enmendada, 25 L.P.R.A. secs. 331-331aa, la Asam-blea Legislativa creó el Cuerpo de Bomberos de Puerto Rico. Este Cuerpo tiene como obligación “prevenir y com-batir fuegos, salvar vidas, garantizar a los ciudadanos en general una protección adecuada contra incendios, así como determinar, una vez ocurrido el siniestro, el origen y *763 las causas del incendio”.(42) 25 L.P.R.A. sec. 331a. Este Cuerpo está integrado por “el Jefe de Bomberos, Jefes Auxiliares de Bomberos,(43) Comandantes de Bomberos, Capitanes, Tenientes, Sargentos, Cabos, Bomberos, Bom-beros Auxiliares, Bomberos Voluntarios e Inspectores”. 25 L.P.R.A. sec. 331b. Estos rangos se podrán “crear, eliminar, consolidar y modificar ... según surjan las necesidades del servicio”. Id.
El Cuerpo de Bomberos lo dirige un Jefe de Bomberos, “quien [es] nombrado por el Gobernador de Puerto Rico con el consejo y consentimiento del Senado” y desempeñará su cargo “por un término de seis (6) años o hasta que su suce-sor sea nombrado”. 25 L.P.R.A. sec. 331b. Esta es “la persona encargada de la administración del Cuerpo de Bomberos”. 25 L.P.R.A. sec. 331d. Entre sus deberes y po-deres se encuentran “[a]doptar ... reglas y reglamentos ex-presando en detalle la organización funcional y adminis-tración del Cuerpo de Bomberos” y “las obligaciones, responsabilidades y conducta de sus miembros ...”. 25 L.P.R.A. sec. 331c(a). Véase, además, 25 L.P.R.A. sec. 331g.
El Jefe de Bomberos establecerá, además, “el orden de *764 sucesión en caso de su ausencia, incapacidad o muerte”. 25 L.P.R.A. sec. 331b. En cuanto al referido orden, la Orden Especial 2001-3 del Cuerpo de Bomberos, emitida el 15 de julio de 2001, tiene como propósito establecer el orden de mando (Orden de Sucesión) en los casos donde, por cual-quier circunstancia, el Jefe en propiedad esté ausente. Además, si por alguna razón de peso el jefe responsable de tomar el mando no desee hacerlo, éste le notificará al jefe siguiente en turno para que se haga cargo.
Así, pues, en las instancias en que el Jefe de Bomberos se encuentre ausente, será el Jefe Auxiliar del Negociado de Extinción quien, en primer lugar, le sustituya. En se-gundo lugar le sustituirá el Jefe Auxiliar del Negociado de Administración; en tercer lugar el Jefe Auxiliar de Adies-tramiento, y en cuarto lugar el Jefe Auxiliar de Prevención.
A su vez, la Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, Ley Núm. 184 de 3 de agosto de 2004, según enmendada, 3 L.P.R.A. secs. 1461-1468p, define el interinato como los servicios “temporeros que rinde un empleado de carrera en un puesto cuya clasificación es superior a la del puesto para el cual tiene nombramiento oficial, en virtud de una designación escrita de parte de la autoridad nominadora o su representante autorizada y en cumplimiento de las demás condiciones legales aplicables”. 3 L.P.R.A. see. 1461.
Cuando un empleado de carrera rinde servicios temporeros en calidad de interinato, asume el cargo superior con todas las obligaciones, responsabilidades y facultades que dicho cargo conlleva. Ahora, en cargos que requieran el consejo y consentimiento del Senado, el interinato queda sin efecto “ ‘al levantarse la sesión ordinaria de la Asamblea Legislativa en curso o, en su defecto, la siguiente, al comienzo del interinato, a menos que se efectúe antes del nombramiento en propiedad’.... Esa y no más es la expectativa de continuidad que puede tener un *765 funcionario incumbente bajo una cláusula de continuidad”. Nogueras v. Hernández Colón, 127 D.P.R. 638, 652 (1991).
V
A. En los recursos CT-2010-0001 y CT-2010-0002, los recurridos SBUPR y SPU alegaron que la Ley Núm. 7, supra, es inconstitucional porque se aprobó en abierta viola-ción a la Sec. 17 del Art. Ill de la Constitución de Puerto Rico, supra, la cual prohíbe que se apruebe una ley que contenga más de un solo asunto. A esos efectos, indicaron que la Ley Núm. 7, supra, es un estatuto incongruente, que combina legislación sobre materias y que deroga “una serie de leyes, reglamentos y políticas públicas establecidas, es-pecialmente cuando ha desmantelado de facto agencias cu-yas políticas públicas expresamente consignadas en esta-tutos no han sido oficialmente derogadas”. Alegato de la parte recurrida (CT-2010-002). No les asiste la razón.
La Ley Núm. 7, supra, es un estatuto especial de natu-raleza económica y su propósito es salvar el crédito de Puerto Rico dada la emergencia fiscal por la cual atraviesa el Estado. Art. 2 de la Ley Núm. 7, supra. Además, el título del referido estatuto revela claramente que el único asun-to(44) o materia regulada es las finanzas del erario. En con-secución de ello, el legislador adoptó un método compuesto, el cual surge también del título de la referida ley y consiste en declarar un estado de Emergencia Fiscal y establecer un plan integral para emergencia fiscal declarada.
Asimismo, debido a que la Ley Núm. 7, supra, es un estatuto de corte económico y que el asunto regulado es las finanzas del erario, ello implica —naturalmente— que di *766 cho estatuto tendrá un alcance amplio. De igual forma, esto presupone que se emplearán mecanismos de natura-leza económica, tales como medidas de ingresos, reducción de gastos y corte financiero, sin necesidad que todas ellas se expresen minuciosamente en el título de la ley. Herrero y otros v. E.L.A., supra, pág. 295; Laboy v. Corp. Azucarera Saurí & Subirá, supra; Martínez v. People of Puerto Rico, supra.
Sin embargo, aun cuando la Ley Núm. 7, supra, adoptó un acercamiento dual en consecución de su asunto, ello no equivale a concluir que dicho estatuto es inconstitucional porque se aprobó en violación a la Sec. 17 del Art. Ill de la Constitución de Puerto Rico, supra. Todo lo contrario. Ante la evaluación judicial de una ley al amparo de la “regla de un solo asunto”, el método que escogió el legislador para alcanzar el asunto regulado por dicho estatuto no debe ser razón para decretar su inconstitucionalidad. Ello, siempre y cuando exista una relación directa entre el título de la ley y el asunto regulado, y que éste no introduzca materias incongruentes entre sí o induzca a error. Herrero y otros v. E.L.A., supra, pág. 295. Véase, además, Laboy v. Corp. Azucarera Saurí & Subirá, supra, pág. 426.
El título de la Ley Núm. 7, supra, es lo suficientemente descriptivo del asunto que regula y la forma en que lo regula. Su mera lectura revela que existe una relación directa entre el título, el asunto que regula y los métodos escogidos para regularlo. Aquí, contrario a lo ocurrido en Laboy v. Corp. Azucarera Saurí & Subirá, supra, el asunto regulado no introduce materias ajenas o incongruentes en-tre sí, como tampoco induce a error. Quien lee el título de la Ley Núm. 7, supra, fácilmente deduce que se trata de un estatuto económico y que éste regula asuntos de la misma índole, todos vinculados entre sí. Herrero y otros v. E.L.A., supra, pág. 295. Además, la “regla de un solo asunto” no está diseñada “como subterfugio para destruir legislación *767 válida, sino como garantía de que el proceso legislativo se realice de forma transparente, de manera que cada pro-yecto de ley se discuta y se analice a cabalidad antes de ser aprobado”. íd., págs. 295-296.
Consecuentemente, sostenemos la constitucionalidad de la Ley Núm. 7, supra. Esta no se aprobó en violación a la Sec. 17 del Art. Ill de la Constitución de Puerto Rico, supra, pues comprende “ ‘todas las materias afines al asunto principal y todos los medios que puedan ser justamente considerados como accesorios y necesarios o apropiados para llevar a cabo los fines que están propiamente com-prendidos dentro del asunto general’ ” de dicho estatuto. Herrero y otros v. E.L.A., supra, pág. 296.
De igual forma, colegimos que la Ley Núm. 7, supra, no contiene disposición legal alguna que haya sido “montada” o incorporada mediante la práctica indeseada del “logrolling”. Más bien, este estatuto representa el vehículo jurídico escogido por nuestra Asamblea Legislativa para atender un solo asunto:
... la necesidad de lograr la estabilización fiscal del Go-bierno de Puerto Rico y proteger su crédito mediante: (a) nue-vas medidas [de] ingresos y de mejor fiscalización; (b) medidas de control y reducción de gastos; (c) medidas fiscales y de fi-nanciamiento [para] cubrir insuficiencias presupuestarias en lo que las medidas de ingresos y control de gastos surten efecto, financiar los costos asociados con la implantación de las medidas de reducción de gastos, y evitar impactos adversos en el Fondo General por la precariedad fiscal de algunas corpora-ciones públicas y municipios. Art. 2 de la Ley Núm. 7, supra. (45)
B. En los recursos CT-2010-0001 y AC-2010-0018, los *768 recurridos SBUPR y FCT alegan que los despidos de sus miembros son nulos toda vez que las cartas de cesantía no se notificaron simultáneamente. En específico, aducen que las referidas cartas son defectuosas porque las notificaron en detrimento del principio de simultaneidad contenido en el Art. 37.04(b) de la Ley Núm. 7, supra, y que ello acarrea la nulidad de sus cesantías. No les asiste la razón.
El procedimiento de notificación de las cesantías decre-tadas a partir de la Ley Núm. 7, supra, y los requisitos con los cuales éstas tienen que cumplir están descritos en el Art. 37.04(b) del referido estatuto. Así, como mencionára-mos anteriormente, toda cesantía decretada al amparo del referido estatuto tiene que: (1) informarse mediante comu-nicación escrita y (2) dicha comunicación escrita tiene que: (a) remitirse al empleado cesanteado con al menos treinta días de anticipación a la fecha de efectividad de su despido; (b) informar al empleado la fecha en que su despido será efectivo, y (c) apercibir al empleado cesanteado sobre su derecho a solicitar revisión de la decisión de la agencia.
Incluso, cuando al empleado cesanteado lo represente una organización sindical, se le informará de la cesantía mediante una comunicación escrita, aparte de la enviada al empleado despedido. En este caso, el apercibimiento so-bre su derecho a solicitar la revisión de su cesantía debe indicar que el foro apropiado para ejercer este derecho es la CRTSP, con la cual el Tribunal de Primera Instancia com-parte jurisdicción. Véase Báez Rodríguez et al. v. E.L.A., 179 D.P.R. 231 (2010).
Como podemos apreciar, el Art. 37.04(b) de la Ley Núm. 7, supra —analizado en su totalidad— no requiere que las cesantías decretadas a su amparo se notifiquen simultá-neamente al empleado despedido y a la organización sindical que lo representa. Su lenguaje es claro, explícito y no presenta ambigüedad alguna. Por ello, no debe ser malin-terpretado bajo el pretexto de cumplir con su espíritu, “máxime cuando el espíritu o intención del estatuto y su letra son la misma cosa”. Pueblo v. Castro Muñiz, supra, pág. 650. Véase Román v. Superintendente de la Policía, *769 supra, pág. 688. Véase, además, Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. Más bien, en cuanto a requisitos tem-porales, el Art. 37.04(b) sólo exige que la carta de cesantía se notifique con, al menos, treinta días de anticipación a la fecha en que el despido será efectivo, y que la fecha de notificación será la de su entrega o envío. Art. 37.04(b)(12) y (15) de la Ley Núm. 7, supra.
Además, contrario a lo ocurrido en Comisionado Seguros P.R. v. Integrand, supra, y en Medina Sánchez v. Swiss Chalet, supra, el Art. 37.04(b) no contiene término o con-cepto alguno que —tan siquiera— insinúe que la intención del legislador fue exigir que las cartas de cesantía se noti-ficaran simultáneamente. Precisamente, por no contener término o concepto alguno que así lo exija, este Tribunal debe abstenerse de incorporar en el Art. 37.04(b) requisitos de notificación adicionales.
En otras palabras, no podemos caer ante la tentación de interpretar un estatuto de forma acomodaticia para incor-porar en éste una voluntad ajena a la que el legislador contempló, tentación demostrada por la parte recurrida en Medina Sánchez v. Swiss Chalet, supra. Aquí, a diferencia de Comisionado Seguros P.R. v. Integrand, supra, y de Medina Sánchez v. Swiss Chalet, supra, no hay término o con-cepto cuyo significado sea medular para resolver la contro-versia presentada. El texto de la Ley Núm. 7, supra, no refleja que la voluntad del legislador haya sido exigir que las cartas de cesantía se notifiquen simultáneamente al empleado cesanteado y a la unión que lo representa. De haberlo querido, así lo hubiese expresado.
Ahora bien, somos conscientes de que en el ámbito judicial este Tribunal ha resuelto que los dictámenes judiciales deben notificarse simultáneamente a todas las partes invo-lucradas en el pleito, de modo que no se generen dos (2) términos distintos para revisar dicho dictamen ante un foro de mayor jerarquía. Véanse: Caro v. Cardona, 158 D.P.R. 592, 599-600 (2003); Medio Mundo, Inc. v. Rivera, 154 D.P.R. 315, 331 (2001); Rodríguez Mora v. García Lloréns, 147 D.P.R. 305, 310 (1998). A raíz de ello, la nueva *770 Regla 65.3 de Procedimiento Civil de 2009 (32 L.P.R.A. Ap. V) contempla explícitamente la norma de simultaneidad. Informe de Reglas de Procedimiento Civil, 2008, pág. 752 (“[e]l inciso (a) de la Regla 65.3 [,] se enmendó para indicar que la notificación a las partes por el Secretario debe ha-cerse en la misma fecha”). (Enfasis nuestro.)
Sin embargo, esta norma no se debe aplicar análoga-mente a los procedimientos de notificación contemplados por el Art. 37.04(b) de la Ley Núm. 7, supra. Ello se debe a que la norma de simultaneidad contenida en la Regla 65.3 de Procedimiento Civil, supra, es de naturaleza procesal, aplicable exclusivamente dentro del cauce judicial. Por ello, de resolver lo contrario, incurriríamos en un acto de legislación judicial en claro detrimento de la doctrina de separación de poderes.
Como consecuencia de lo anterior, al resolver que la Ley Núm. 7, supra, no exige que las cartas de cesantía se noti-fiquen simultáneamente, entendemos que el término de treinta días de anticipación antes descrito comenzará a calcularse, como bien indica el subinciso (12) del Art. 37.04(b) (“La fecha de notificación será la de su entrega o envío”), desde la fecha en que la carta de cesantía se le notifica a la última parte que debe ser informada, ya sea mediante entrega personal o desde que se envía por correo certificado con acuse de recibo. De esta forma evitamos in-currir en la práctica poco favorecida de incorporar por fíat judicial requisitos que el legislador nunca contempló.
Por su parte, en el recurso AC-2010-0018, la FCT alegó que no le notificaron los despidos de sus miembros me-diante comunicación escrita distinta a la enviada a los em-pleados que representa. A esos efectos, la FCT indicó que su notificación fue defectuosa porque sólo se le hizo en-trega de un expediente que contenía copias de las cartas de cesantías remitidas a los empleados despedidos. Le asiste la razón.
Ciertamente, la entrega de estas copias que no reflejan la fecha en que se notificó a la organización sindical, cons-tituye una notificación defectuosa. Los peticionarios debie- *771 ron cursarle a la unión una comunicación escrita aparte, acompañada o no de anejos, que cumpliera con todos los requisitos contemplados en el Art. 37.04(b) de la Ley Núm. 7, supra, e informara claramente la fecha cuando se le no-tificó a la organización sindical. (46) Sólo así la FCT hubiese sido notificada debidamente de las cesantías decretadas. Ello no ocurrió.
No obstante, a pesar que la FCT fue notificada defectuo-samente de las cesantías de los empleados que representa, este defecto en la notificación no tiene el alcance que ésta le atribuye. Las cesantías decretadas a raíz de la Ley Núm. 7, supra, no son nulas por haber sido notificadas defectuosamente. Más bien, cuando se notifica defectuosa-mente una carta de cesantía lo que procede es que la parte perjudicada ejerza su derecho a revisar la decisión admi-nistrativa ante el foro con jurisdicción para ello, sin suje-ción a los términos dispuestos por ley, siempre y cuando no incurra en incuria. Molini Gronau v. Corp. P.R. Dif. Púb., supra, pág. 687.
En esta ocasión, aun cuando la FCT recibió tales notifi-caciones, ésta acudió oportunamente ante el Tribunal de Primera Instancia para revisar la decisión de las agencias. Más aún, el foro primario, en vez de conceder automática-mente el remedio solicitado, actuó conforme a nuestras ex-presiones en Molini Gronau v. Corp. P.R. Dif. Púb., supra. Así, atendió los méritos de la controversia presentada y dictó sentencia conforme al derecho sustantivo. Incluso, concedió el remedio solicitado.
Consecuentemente, concluimos que el anterior trámite procesal no refleja que el derecho de revisión de los em-pleados cesanteados haya sufrido lesión alguna como con-secuencia de la notificación defectuosa que se le hiciera a la organización sindical que los representa. Todo lo *772 contrario. Aun cuando la FCT fue notificada defectuosa-mente de las cesantías de sus miembros, éstos han gozado y ejercido diligentemente todas las garantías que emanan del debido proceso de ley, y siempre tuvieron disponible el foro con jurisdicción para ejercer su derecho de revisión.
A igual conclusión llegamos en cuanto a las alegaciones de SPU en el recurso CT-2010-0002 sobre las notificaciones de sus cesantías con menos de treinta días de anticipación a la fecha de efectividad de su despido. Aun cuando coinci-dimos con los planteamientos esbozados por SPU y enten-demos que dichas cartas de cesantía se notificaron defec-tuosamente, los recurridos acudieron diligente y oportunamente ante el Tribunal de Primera Instancia para ejercer su derecho de revisión y sus reclamos han sido atendidos, mas no desestimados por falta de jurisdicción. Molini Gronau v. Corp. P.R. Dif. Púb., supra. Por ello, ni su derecho a revisión ni las garantías que emanan del debido proceso de ley —a las cuales tienen perfecto derecho— han sido lesionadas por las notificaciones defectuosas.
C. En el recurso CT-2010-0001, los recurridos SBUPR alegaron que las cartas de cesantía notificadas son nulas porque las firmó el Jefe de Bomberos Interino, Sr. Pedro A. Vázquez Montañez, quien presuntamente no tenía capaci-dad jurídica para ello porque el Gobernador no lo nombró ni lo confirmó el Senado para el puesto de Jefe de Bombe-ros del Cuerpo de Bomberos de Puerto Rico. No les asiste la razón.
Como mencionamos anteriormente, todo empleado pú-blico de carrera en un puesto cuya clasificación es superior a la del puesto para el cual tiene nombramiento oficial ejerce ese puesto superior en calidad de interinato. Así, cuando el empleado asume el cargo en calidad de interi-nato, también asume todas las obligaciones, responsabili-dades y facultades que dicho cargo conlleva. Este interi-nato no podrá subsistir más allá del final de la sesión legislativa siguiente a la fecha en que se produjo la vacante que se llenó mediante el interinato. Nogueras v. Hernández *773 Colón, supra; Hernández Agosto v. López Nieves, 114 D.P.R. 601 (1983).
En esta ocasión, el señor Vázquez Montañez asumió la jefatura del Cuerpo de Bomberos de Puerto Rico en calidad de interinato el 16 de septiembre de 2009, día en que sur-gió la vacante y meses antes de la fecha en que las cartas de cesantía se notificaron. Asimismo, el señor Vázquez Montañez fungió como jefe de bomberos interino hasta el 3 de marzo de 2010, cuando el Senado confirmó a su suce-sora, la Sra. Carmen G. Rodríguez Díaz, para ocupar el puesto. Ello ocurrió, como podemos apreciar, antes que fi-nalizara la primera sesión legislativa ordinaria. Nogueras v. Hernández Colón, supra; Hernández Agosto v. López Nieves, supra. Véase, además, Reglamento de la Cámara 118 de 12 de enero de 2009, Regla 18, Sec. 18.2.(47) Por consi-guiente, resulta forzoso concluir que el señor Vázquez Montañez tenía plena capacidad jurídica para firmar las cartas de cesantía impugnadas, por lo que éstas no son nulas.
D. Por último, en el recurso CT-2010-0002, los recurri-dos SPU alegaron que a varios de sus miembros no le no-tificaron, de forma alguna, sus despidos, que ello los ha dejado en un estado de indefensión y que se les ha privado de un interés propietario en abierta violación al procedi-miento establecido en el Art. 37.04(b) de la Ley Núm. 7, supra.
Según hemos expresado, este artículo claramente indica que la agencia notificará las cesantías mediante comunica-ción escrita y de la forma antes expuesta. Ello, presunta-mente, no ocurrió en esta ocasión. Sin embargo, por no contar con prueba fehaciente que revele si los empleados despedidos y, de ser el caso, la organización sindical que los representa, fueron o no notificados de sus cesantías, pro- *774 cede que devolvamos el expediente al Tribunal de Primera Instancia para que reciba prueba al respecto. Así, si no les notificaron, el foro primario deberá ordenar el trámite de la notificación, según lo aquí pautado. De lo contrario, si el tribunal de instancia encuentra que los empleados despe-didos y la organización sindical que los representa fueron notificados de sus cesantías, deberá dictar sentencia de conformidad con esta opinión.
VI
Por los fundamentos antes expuestos, colegimos que la Ley Núm. 7 de 9 de marzo de 2009, según enmendada, conocida como Ley Especial Declarando Estado de Emer-gencia Fiscal y Estableciendo Plan Integral de Estabiliza-ción Fiscal para Salvar el Crédito de Puerto Rico, es cons-titucional en todos los aspectos cubiertos por esta opinión. Resolvemos, además, que el Art. 37.04(b) del referido esta-tuto no exige que las cartas de cesantía se notifiquen simultáneamente.
De igual forma, resolvemos que los incisos (12) y (15) del Art. 37.04(b) de la Ley Núm. 7, supra, requieren que las cesantías decretadas a raíz de dicho estatuto se notifiquen a la organización sindical que representa al empleado des-pedido mediante una comunicación escrita, aparte de la que se envía al empleado. Por último, resolvemos que el Sr. Pedro A. Vázquez Montañez estaba plenamente facultado para firmar las cartas de cesantía notificadas.
De acuerdo con lo anterior, declaramos “no ha lugar” las solicitudes de injunction en los recursos CT-2010-0001 y CT-2010-0002, y revocamos la sentencia que dictó el Tribunal de Apelaciones en AC-2010-0018. Devolvemos el expe-diente CT-2010-0002 al Tribunal de Primera Instancia, se-gún lo antes expresado.

Se dictará sentencia de conformidad.

 Conforme la Certificación Número 037 de 2 de diciembre de 2002, emitida por la Comisión de Relaciones del Trabajo del Servicio Público (CRTSP), el Sindicato de Bomberos Unidos de Puerto Rico (SBUPR) es el representante exclusivo de todos los empleados administrativos y de mantenimiento del Cuerpo de Bomberos de Puerto Rico.

 Véase Apéndice del Recurso de certificación CT-2010-0001, págs. 1-22.

 íd., págs. 3 y 7-9.

 íd., pág. 8.

 íd., pág. 21. Además, al igual que en Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1 (2010), cert. denegado, Castro v. Puerto Rico, 131 S.Ct. 152 (2010), el SBUPR alegó en su demanda que el no haber celebrado una vista previo a decretar las cesantías violaba los derechos constitucionales de sus miembros; que la delegación de poderes a la Junta de Reestructuración y Estabilidad Fiscal (JREF) era excesiva, y que las disposiciones de la Ley Núm. 7 de 9 de marzo de 2009 menoscaban las obligaciones contractuales. Por ello concluyó, entre otras cosas, que dicho estatuto es inconstitucional. Véase Apéndice del Recurso de Certificación CT-2010-0001, págs. 2 y 8-22.

 Véase Apéndice del Recurso de certificación CT-2010-0001, págs. 7-9.

 íd., pág. 8.

 íd., pág. 21.

 Los Servidores Públicos Unidos de Puerto Rico / AFSCME, Concilio 95 (SPU) es una organización sindical que agrupa empleados de diferentes agencias del go-bierno central y en las cuales es el representante exclusivo, según certificada por la CRTSP en virtud de la Ley Núm. 45 de 25 de febrero de 1998, según enmendada, mejor conocida como Ley de Relaciones del Trabajo para el Servicio Público de Puerto Rico. Véase Apéndice del Recurso de certificación CT-2010-0002, pág. 2.

 Véase Apéndice del Recurso de certificación CT-2010-0002, págs. 85-88.

 íd., pág. 85. Además, al igual que en Domínguez Castro et al. v. E.L.A. I, supra, la SPU alegó en su demanda que la Ley Núm. 7, supra, era inconstitucional porque violaba el debido proceso de ley, menoscababa las obligaciones contractuales del Estado y contemplaba una delegación de poderes excesiva a la JREF. Todo ello motivado por un “supuesto” estado de emergencia fiscal. Por ello concluyó que dicho estatuto es inconstitucional. Véase Apéndice del Recurso de certificación CT-2010-0002, págs. 77-85.

 Véase Apéndice del Recurso de certificación CT-2010-0002, pág. 88.

 Id. Además, al igual que en Domínguez Castro et al. v. E.L.A. I, supra, el SPU solicitó que se declarara la inconstitucionalidad de la Ley Núm. 7, supra, por autorizar a la JREF a efectuar cesantías que menoscababan las obligaciones contrac-tuales del Estado; por autorizar una delegación de poderes excesiva e indebida a la JREF, y por violar el debido proceso de ley sustantivo y el derecho fundamental al trabajo. Véase Apéndice del Recurso de certificación CT-2010-0002, págs. 88-89.

 El 21 de septiembre de 2010 emitimos una resolución mediante la cual ordenamos la consolidación de los dos recursos de certificación presentados por el Estado, CT-2010-0001 y CT-2010-0002, debido a que ambos recursos presentan cues-tiones comunes de derecho. Regla 38.1 de de Procedimiento Civil de 2009 (32 L.P.R.A. Ap. V).

 De acuerdo con la Ley Núm. 45, supra, la Federación Central de Trabaja-dores (FCT) es una organización sindical legítimamente constituida que representa a empleados del sector público del Gobierno de Puerto Rico. Entre éstos se encuentran aquellos empleados comprendidos en las unidades apropiadas, certificadas por la CRTSP, en el Departamento de la Vivienda y en el Departamento de Recreación y Deportes. Véase Apéndice del Recurso de certiorari AC-2010-0018, pág. 93.

 Véase Apéndice del Recurso de certiorari AC-2010-0018, págs. 1-7.

 Varias de estas cesantías entrarían en efecto el 6 de noviembre de 2009 y el restante el 8 de enero de 2010. Véase Apéndice del Recurso de certiorari AC-2010-0018, págs. 94 y 265.

 Véase Apéndice del Recurso de certiorari AC-2010-0018, pág. 3.

 Estos despidos entrarían en vigor el 6 de noviembre de 2009. Véase Apén-dice del Recurso de certiorari AC-2010-0018, pág. 95.

 Véase Apéndice del Recurso de certiorari AC-2010-0018, pág. 3.

 íd., pág. 6.

 íd., págs. 83-86.

 íd., págs. 8-52.

 El 7 de diciembre de 2009, la parte demandada presentó ante este Foro un recurso de certificación y una moción al amparo de la Regla 28(A) de nuestro Regla-mento, 4 L.P.R.A. Ap. XXI-A. Ambos recursos fueron declarados “no ha lugar” me-diante Resolución de 16 de diciembre de 2009. Véase Apéndice del Recurso de certio-rari AC-2010-0018, pág. 89.

 Véase Apéndice del Recurso de certiorari AC-2010-0018, pág. 108.

 íd., pág. 109.

 íd., págs. 119-120.

S) íd., págs. 219-221.

 íd., págs. 247-285.

 A saber: CT-2009-0004; CT-2009-0005; CT-2009-0006; CT-2009-0009.

 El logrolling es una práctica legislativa a través de la cual grupos minori-tarios de legisladores combinan, en un solo proyecto de ley, distintas propuestas incongruentes entre sí con el propósito de que, al momento de la votación de dicha medida, ésta obtenga una mayoría artificial proveniente de la unión de esos grupos. Herrero y otros v. E.L.A., 179 D.P.R. 277, 293 (2010). Vease, además, 1A Singer y Singer, Statutes and Statutory Construction Sec. 17.1, pág. 7 (7ma ed. 2009).

 Los riders constituyen disposiciones de ley no favorecidas por la mayoría legislativa y no relacionadas con el asunto principal atendido en la legislación. Sin embargo, “son añadidas o ‘montadas’ en proyectos de ley [que] por su aceptación pública o por su necesidad para el buen funcionamiento del gobierno”, se aprueban posteriormente. Herrero y otros v. E.L.A., supra, págs. 293-294. Véanse, además: Singer y Singer, supra, págs. 7-8; J.J. Alvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis, 2009, pág. 244.

 Se arguye, además, que la inclusión de riders en la legislación afecta el poder de veto del Ejecutivo. En ese sentido, ante una pieza legislativa que contenga disposiciones “montadas”, el Primer Ejecutivo tendría

 La Ley Núm. 42 de 1 de agosto de 2005 no advino efectiva dado el veto de bolsillo que impartió el Gobernador a la Resolución Conjunta Núm. 445 sobre el Presupuesto General 2005-2006.

 El Art. 2.220 del Código de Seguros, 26 L.P.R.A. see. 222, rige todo lo con-cerniente al proceso de vistas en los procedimientos administrativos que se ventilan ante la Oficina del Comisionado de Seguros y así dispone:
“(1) El Comisionado celebrará las siguientes:
“(a) Vistas requeridas por disposición de este título.
“(b) Vistas consideradas necesarias por el Comisionado para fines que cai-gan dentro del alcance de este título.
“(c) Vistas solicitadas por cualquier persona perjudicada por algún acto, amenaza de acto, informe, promulgación, regla, reglamento u orden del Com-isionado.
“(2) Toda solicitud para una vista deberá ser por escrito, deberá especificar los extremos en que la persona que la solicita ha sido peijudicada y los fundamentos en *752 que habrá de basar su solicitud. El Comisionado celebrará la vista así solicitada dentro de sesenta días después de recibir la solicitud, a menos que se posponga de común acuerdo.”

 Ley Núm. 130 de 13 de junio de 1967 (17 L.P.R.A. sec. 502 et seq.), conocida como Ley de la Oficina del Oficial de Construcción.

 Reglamento para Regular las Distintas Actividades que se Llevan a Cabo en el Negocio de la Construcción de Viviendas Privadas en Puerto Rico, Reglamento Núm. 2268 del Departamento de Asuntos del Consumidor de 16 de septiembre de 1977.

 31 L.P.R.A. sec. 1291 et seq.

 Al señalar “y, además, de ser el caso, a la organización sindical”, los incisos (12) y (15) del Art. 37.04(b) de la Ley Núm. 7, supra, claramente establecen la nece-sidad de remitirle a la unión una comunicación escrita aparte de la misiva dirigida al empleado cesanteado.

 En Báez Rodríguez et al. v. E.L.A., 179 D.P.R. 231, 244 (2010), resolvimos que el Tribunal de Primera Instancia comparte jurisdicción con la CRTSP para aten-der toda controversia que no se limite a la antigüedad de un empleado cesanteado.

 “La doctrina de incuria se ha definido como ‘[la] dejadez o negligencia en el reclamo de un derecho, los cuales en conjunto con el transcurso del tiempo y otras circunstancias que causan peijuicio a la parte adversa, opera como un impedimento en una corte de equidad’.”Molini Gronau v. Corp. P.R. Dif. Púb., 179 D.P.R. 674, 687 (2010).

 Conforme al inciso (2) del Art. 3 de la Ley Núm. 184 de 3 de agosto de 2004, según enmendada, conocida como Ley para la Administración de los Recursos Hu-manos en el Servicio Público del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 1461(2), el Cuerpo de Bomberos de Puerto Rico es catalogado como xm Adminis-trador Individual. Véase Reglamento de Personal para el Servicio de Carrera, Re-glamento Núm. 4439 del Cuerpo de Bomberos de Puerto Rico de 7 de mayo de 1991, pág. 2.

 El Art. 7 de la Ley Núm. 43 de 21 de junio de 1988, según enmendada, conocida como Ley del Cuerpo de Bomberos de Puerto Rico, 25 L.P.R.A. sec. 33 Id, define y crea el puesto de Jefes Auxiliares. Sobre ello, este artículo indica lo si-guiente:
“Se crean por la presente los puestos de Jefes Auxiliares de Bomberos, los que responderán directamente al Jefe de Bomberos y servirán en dichas posiciones a discreción de éste. Los Jefes Auxiliares estarán en el Servicio de Confianza. Dichos Jefes Auxiliares de Bomberos tendrán a su cargo las áreas operacionales que por reglamento se establezcan y serán responsables de la administración y supervisión del personal a su cargo. Cualquier miembro regular del Cuerpo de Bomberos podrá ser nombrado Jefe Auxiliar. Cuando esto ocurra, retendrá su rango permanente y una vez cesen en sus funciones como Jefes Auxiliares regresarán a su rango perma-nente y al sueldo que al momento le correspondería de haber estado ejerciendo el puesto.”

 El diccionario de la Real Academia Española define el término “asunto” como: “1 Materia de que se trata; 2 Tema o argumento de una obra; 3 Aquello que se representa en una composición pictórica o escultórica; 4 Negocio, ocupación, quehacer.” Diccionario de la Lengua Española, 22da ed., Madrid, Ed. Espasa-Calpe, 2001, T. 1, pág. 235.

 Somos conscientes de nuestras expresiones en Herrero y otros v. E.L.A., supra, pág. 306, cuando señalamos que “si la Ley Núm. 42 o una medida similar a esa, hubiese sido incluida en el texto de la Resolución del Presupuesto General, dicha disposición probablemente sería inconstitucional en tanto se trataba de un recaudo y, por disposición constitucional, el Presupuesto sólo puede contener asignaciones y reglas para su desembolso”. Ello, sin embargo, no altera nuestra decisión en el caso de autos. Contrario a lo que ocurre con el Presupuesto General, el asunto de la Ley Núm. 7, supra, no está limitada constitucionalmente a sólo incluir reglas y asigna-ciones de desembolsos. Más bien, incluye todos los métodos diseñados para atender la crisis fiscal del Gobierno.

 Entendemos, además, que esta notificación a la organización sindical se puede efectuar mediante la entrega de copias de las cartas de cesantía enviadas a los empleados. Ello, siempre y cuando se desprenda de dicha notificación la fecha en que se le notificó a la unión. De esta forma el término para acudir al foro con jurisdicción para revisar la decisión de la agencia podrá calcularse adecuadamente.

 La Sec. 18.2 de la Regla 18 del Reglamento de la Cámara de Representantes dispone que la primera sesión legislativa comienza el segundo lunes de enero y ter-mina el 30 de junio del mismo año. Además, habrá una segunda sesión que comienza el tercer lunes de agosto y termina el martes previo al tercer jueves del mes de noviembre.